994 A.2d 968

Susan Eynon LARK

v.

MONTGOMERY HOSPICE, INC.

No. 140 Sept.Term, 2007.

Court of Appeals of Maryland.

May 13, 2010.

216

Lee Boothby, Washington, DC, for Appellant.

Brief of Public Justice Center, Voices for Quality Care, Inc., United Seniors of Maryland, Maryland Nurses Coalition, and American College of Nurses-Midwives as Amici Curiae for

Appellant: Gregory P. Care, Esquire, Francis D. Murnaghan, Jr., Appellate Advocate Fellow, Baltimore, MD.

Lauri E. Cleary (Marc R. Engel and Michael J. Neary of Lerch, Early & Brewer, Chartered, Bethesda, MD), on brief for Appellee.

ARGUED BEFORE: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, IRMA S. RAKER, (Retired, Specially Assigned) and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

MURPHY, Judge.

The parties to this appeal from the Circuit Court for Montgomery County,[1] Susan Eynon Lark (Appellant), and Montgomery Hospice Inc. (Appellee), present us with two questions of statutory interpretation.[2] We must determine

---

**1.** Because no prior appellate decision has been rendered in the case at bar, the designation of the parties is controlled by Md. Rule 8–111(a)(1).

**2.** The parties do not agree on precisely what questions are presented for our review. According to Appellant, this case presents four questions:

1. Must a health care worker report or threaten to report unlawful acts to an external board, after first reporting it to the supervisor, in order to be protected by the Health Care Worker Whistleblower Protection Act (the "Act")?
2. Does the Health Care Worker Whistleblower Protection Act, when referring to "an activity, policy, or practice of the employer," include those acts engaged in by a supervisor or other employee, while carrying out their routine work, as an incident of the duties entrusted to them by the employer?
3. Did the trial court err in dismissing [Appellant's] Complaint in light of the existing record, by finding that she had not complied with all of the requirements of the Act?
4. In the alternative, does a health care worker have a viable claim for wrongful discharge, when the termination arises in retaliation for reporting internally to management a violation of state law and/or Board of Nursing regulation, if the employee had a legal duty to report actions which pose a serious health care and safety risk to patients and others?

According to Appellee, this case actually presents three questions:

1) Did the trial court err in entering summary judgment against a hospice nurse seeking relief under the Health Care Worker [Whistleblower] Protection Act, because the nurse failed to report externally to an appropriate board her belief that her employer was

whether a former employee is entitled to assert a wrongful discharge action under the Health Care Worker Whistleblower Protection Act (1) even if he or she never reported to an external board "an activity, policy, or practice of the [former] employer that is in violation of a law, rule, or regulation;" and/or (2) the "unlawful acts" that he or she threatened to report were errors committed by fellow employees who did not have the authority to establish the former employer's "policy, or practice." For the reasons that follow, we hold that (1) the report of unlawful acts to an external board is *not* a condition precedent to a civil action under the Act, and (2) when a fellow employee's repeated violation of a law, rule, or regulation is reported to a supervisor, the failure or refusal to correct the violation constitutes a prohibited act of the employer. We shall therefore vacate the summary judgment entered against Appellant and in favor of Appellee, and remand for further proceedings not inconsistent with this opinion.

### Background

Appellant filed a three count SECOND AMENDED COMPLAINT that included the following assertions:

2. This is an action for: (1) wrongful discharge contrary to and in violation of a clear mandate of public policy[, asserted in Count I], (2) breach of an employment undertaking as set forth in [the] Personnel Manual [of Mont-

engaged in unlawful activity posing a substantial and specific danger to the public health or safety?

2) Did the trial court err in entering summary judgment against a hospice nurse seeking relief under the Health Care Worker [Whistleblower] Protection Act, because the activity, policy, or practice of which the nurse complained consisted of errors committed by co-employees allegedly violating laws, rules, or regulations governing the conduct of those co-employees rather than the employer hospice?

3) Did the trial court err in declining to create a new public policy exception to Maryland's at-will employment doctrine allowing a nurse to sue her employer for wrongful discharge on the basis that she was terminated in retaliation for reporting alleged violations of professional standards, although she never reported or even threatened to report the violations to the Board of Nursing as required by the Maryland laws and regulations that she invokes?

gomery Hospice Inc., Appellee, asserted in Count II], and (3) the violation of the Health Care Worker Whistleblower Protection Act (Sec. 1–501 through 1–505 of the Health Occupation article of the Maryland Code)[, asserted in Count III]. This action is brought by a former employee of [Appellee]. [Appellant] contends that she was fired for actions, reports and disclosures she took in carrying out duties she had under the laws of the State of Maryland as a registered nurse, as well as legal duties she owed to third parties. [Appellant] also contends that she could have been held civilly liable for failure to carry out those duties and could also be subject to discipline by the State Board of Nursing for failure to so act.

\* \* \*

12. Consistent with her obligations under [Appellee's] Personnel Manual, as well as the Maryland statutes and regulations, [Appellant] attempted to bring to her supervisor's attention, charting that was not consistent with the health and safety of [Appellee's] clients. In March of 2004, [Appellant] noted that an admission by one of [Appellee's] RN was not properly documented and was full of errors. [Appellant] made a complaint to [Appellee's] Director of Admissions. It became apparent that the Director of Admissions sought to defend the failures of the RN. No action was taken.

\* \* \*

15. More recently and directly leading to [Appellant's] discharge, on or about January 30, 2007, [Appellant] found that "starter packs" of medications, including narcotics were being sent out. [Appellant] learned that these "starter packs" were being entered into every patient's chart. So many such packs were being sent out that . . . the Director of Week–End and Evening Services and [Appellant's] immediate supervisor, became overwhelmed. [The Director] gave her name and password to her secretary for the issuance of the "starter packs." [Appellant], subsequently learned that the "starter pack" orders, which contained adult narcotic doses, were sent to [Appel-

lant's] pediatric patients. [The Director], when confronted by [Appellant], claimed that these "starter packs" did not actually go out. However, a mother of a patient told [Appellant] the following week that they had received a starter pack at 10:00 p.m. a few nights earlier. [Appellant] learned that such "starter packs" had been delivered to all pediatric patients, including ones where the family situation is unstable with many children and with little close supervision in the house. It took more than a week to get these "starter packs" out of the house.

\* \* \*

18. In addition, [Appellant] had during the period from September 2006 to April 2007, complained to management about acts that she understood were inconsistent with generally accepted professional standards of registered nursing practice and threatened the health and safety of third parties. This included:

a) Narcotic being sent out to individuals who were not hospice patients;

b) Improper documentation of narcotic drugs;

c) Treatment with narcotics provided to patients without a physician's order;

d) Treatment of patients without signatures on initial "start of care" orders;

e) Treatment of patients without current legal orders or with expired orders;

f) Failure of supervisors to follow-up on documentation deficits or on missing medical orders and documentations; and

g) Failure to initiate safety precautions with a patient that had a high risk of hemorrhage.

19. E-mails concerning the above were sent by [Appellant] to Management, including [Appellee's] Vice–President of Clinical Services and [Appellant's] supervisor, in an attempt to comply with her legal and ethical responsibilities. All of these E-mails were on [Appellant's] assigned

computer. On April 13, 2007, [Appellant's] immediate supervisor, requested that [Appellant] come in for her annual evaluation. On April 14, 2007, [Appellant] accompanied [Appellant's supervisor] to a conference room where [Appellee's] Vice–President of Clinical Services and [Appellee's] Vice–President of Medical services, were already present. [Appellee's Vice–President of Clinical Services] immediately handed [Appellant] a memo dated April 14, 2007 charging [Appellant] with alleged "practices [that] are frequently outside the acceptable and safe standards of nursing practice." The memo concluded with the statement: "Effective Immediately: Sue Eynon–Lark's employment with Montgomery Hospice is terminated." [Appellant] contends the statements were unfounded and was not the real reason for her discharge.

\* \* \*

21. [Appellant] had a legal duty to disclose to her supervisors, (including those in management who had authority to take corrective action), the violation of the laws, including but not limited to the Health Occupations Article of the Maryland Code, state and federal narcotic laws, and violations of the rules and regulations of the state Board of Nursing, which require [Appellant] to safeguard clients and the public health and safety, when she had knowledge of [Appellee's] employees['] incompetent, unethical, or illegal practices.

22. [Appellant's] termination, in fact, followed her recent complaints of several breaches in documentation, lack of clinical supervision and the delivery of medications, including narcotics, by others at Montgomery Hospice. These breaches, failures and acts had been brought to the attention of [Appellant's] supervisor and discussed with the Medical Director. These instances of errors increased within the last year. Many of these errors would, in fact, constitute "critical offenses" of such "seriousness that it justifies immediate discharge ...," yet no one at Montgomery Hospice, to [Appellant's] knowledge, had been even disciplined for such violations.

* * *

26. [Appellant] claims that the reason given for her discharge is pretextual and was in fact the result of her complaints to management which were meant to safeguard patients under her care as a registered nurse and for the health and safety of patients which [Appellant] believed were endangered by incompetent, unethical, or illegal practices. [Appellant] claims that she had a duty to bring these matters to the attention of management under Maryland statutory and regulatory law as well as the [Appellee's] own personnel requirements. Failure of [Appellant] to bring violations to the attention of management could also subject [Appellant] to civil liability and subject her to a suspension of her nursing license.

29. [Appellee] violated a clear mandate of public policy set forth by Maryland statutes and duly adopted administrative regulations, as set forth above, when it terminated [Appellant's] employment. [Appellant] had the duty to report to her supervisor and to management, acts and practices, which: (1) violated accepted professional standards in the practice of registered nursing; (2) were inconsistent with the health and safety of a person under [Appellant's] care and/or were [Appellee's] clients; (3) or affected public health and safety because of [Appellee's] incompetent, unethical or illegal practices. [Appellant] also had potential personal liability and was subject to disciplinary action from the Board of Nursing had she failed to make such reports and disclosures. For this reason the discharge was wrongful and unlawful.

Appellee filed a motion to dismiss the Complaint, which was accompanied by a Memorandum that included the following arguments:

Specifically, Counts I and III of the Second Amended Complaint challenge [Appellant's] termination from [Appellee's] employ as a wrongful discharge in violation of public policy and Maryland's Health Care Worker Whistleblower Protection Act, Md.Code Ann., Health Occ. § § 1–501–1–506 (the "Act"), respectively; however, [Appellant's] allega-

tions do not refer to, let alone rely upon any clear mandate of public policy violated by her termination. Moreover, her allegations confirm that she is not entitled to avail herself of the protections of the Act because (1) the wrongdoing she complains of was committed by her fellow employees and not [Appellee]; and (2) she never reported any perceived wrongdoing to the appropriate external board or other authority as required for the Act to apply.

\* \* \*

Significantly, [Appellant] cannot rely on the only Maryland statute and regulation that could possibly provide a public policy claim on facts such as she has alleged. Nurses do have a duty under both statute and regulation to report violations of certain statutes and regulations governing the conduct of other nurses and hospitals. Md. Health Occupations, § 8–505; COMAR 10.27.19.02(A)(7). Both Code section 8.505 and COMAR section 10.27.19.02 *require,* however, that the reports be submitted to the Board of Nursing. *Id.* [Appellant] does not (and cannot) allege that she made any report to the Board of Nursing, a step that is a necessary prerequisite for any claim of wrongful discharge under Maryland law. *See Thompson[ v. Memorial Hosp. at Easton, Maryland, Inc.*], 925 F.Supp. [400] at 407–08 (holding a plaintiff's conduct must conform to the language of the statute on which he bases his claim for wrongful discharge in violation of public policy). For these reasons, [Appellant's] Count I claim of wrongful termination in violation of public policy should be dismissed with prejudice.

\* \* \*

Even if this Court were to determine that [Appellant] may have alleged the type of reporting of wrongdoing that is actionable under the Act, it still should dismiss Count III, because [Appellant] *never* reported the alleged misconduct at issue to the appropriate board. An employee only receives the protections of section 1–502 if:

(1) The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation;

(2) The employer's activity, policy, or practice that is the subject of the employee's disclosure poses a substantial and specific danger to the public health or safety; and (3) *Before reporting to the board:* (i) The employee has reported the activity, policy, or practice to a supervisor or administrator of the employer in writing and afforded the employer a reasonable opportunity to correct the activity, policy, or practice; or (ii) if the employer has a corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation, the employee has followed the plan.

*Id.* § 1–503 (emphasis added). Hence, a prerequisite to coverage under the Act is the actual reporting of wrongdoing to the appropriate board, which is defined in the Act as "any board established under [the Health Occupations] article." *Id.* § 1–501.

As written, the statute clearly sets forth what a claimant employee must do prior to reporting the wrongdoing at issue to the appropriate governing board if the employee is to receive the protections of section 1–502. *Id.* § 1–503(3). This provision necessarily implies that reporting to the board is a mandatory prerequisite to coverage under the Act. If such external reporting were not necessary, then this particular clause would be stripped of all meaning and be rendered surplusage. "[W]henever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Chesapeake and Potomac Telephone [Company of Maryland, et al. v. Director of Finance for the Mayor and City Council of Baltimore],* 343 Md. [567] at 579, 683 A.2d [512] at 517 [(1996)]. Since [Appellant] failed to report the activity at issue to a Board, she is not entitled to the protection of the Act and Count III should be dismissed.

This analysis is entirely consistent with section 1–502 of the Act. As stated above, section 1–502 prevents an employer from taking or refusing "to take any personnel action as reprisal against an employee" because the employee "discloses or threatens to disclose to a supervisor or board."

Md.Code Ann., Health Occ. § 1–502. Section 1–502 clearly contemplates protection for employees who complain about misconduct, but are terminated prior to reporting the wrongdoing to the appropriate board. Section 1–502, however, cannot be read in isolation from the provisions of section 1–503, which acknowledge that an employee ultimately will have reported the wrongdoing to the appropriate board before receiving the protections of section 1–502. *Id.* Hence, an employer cannot evade the Act's mandate by terminating a complaining employee who has not yet been able to notify the appropriate board. Nevertheless, where "a substantial and specific danger to the public health or safety" is at stake, the legislature intended to require an employee to report the situation to the appropriate board prior to running to court to file suit. *Id.* § 1–503(2). The fact is that the errors [Appellant] alleges she reported were simply not serious or systemic enough in nature for [Appellant] to bother to report to the nursing board. She should not now be heard to complain of them as having posed a serious threat to public safety, nor should she be permitted to maintain a multi-million dollar lawsuit as a "whistleblower."

During a pre-trial motions hearing, the Circuit Court elected to treat Appellee's motion to dismiss as a motion for summary judgment, and delivered an on-the-record ruling that included the following analysis:

It's clear ... that [Appellant] at no time threatened [to report] or reported the alleged abuses or infractions to any external board, whether it be a Board of Nursing or whether it be a hospice board, or any governing board that she was employed by, or that would have had supervisory authority over her, or over the hospice, or over the nurses. And clearly, everything she did was internally.

And it's crystal clear that almost all of the abuses that she alleges were done by other employees, other nurses. And she does make reference to the fact of talking to a supervisor, and indicating something about that this is the policy, or this is the way it's done. I do draw a distinction here

that that is not the employer, the supervisor, and that's what I so find in this particular case.

There is no allegation that there is a systemic or institutional conduct on the part of the hospice that violates any statute. the litany of abuses deal with things that are done by the employees, such as, narcotics being sent out to individuals who are not hospice patients; improper documents or ... treatment with narcotics provided to patients without physician's order; and a list of other complaints.

\* \* \*

There's no indication before she filed her suit, which is really the key point. Did she ever complain to a governing board? She kept that internally, which I think is important, a very important distinction, especially when I look at [HO § ]1–502, because it indicates and assume before reporting to the Board, number 3. And that seems to be, to this Court, it's something that's not manufactured, it's not something that I think should be there. It's something that is there in black and white, and assumes that there is going to be a reporting to another board.

\* \* \*

... I find at common law that there's no ... public policy exception here.

Under the [whistleblower's] statute, I don't find that [Appellant] has ... complied with the statute in that there was no threat of reporting to an outside board, nor did she [complain to] an outside board.

\* \* \*

I also find that there [were] no ... contractual rights bestowed upon [Appellant] by the manuals of the policies of the hospice.

Although the Circuit Court entered summary judgment on all three causes of action asserted in the Complaint, Appellant has limited her appeal to the judgment entered against her on Count III. After Appellant noted a timely appeal to the Court of Special Appeals, but before the parties presented their arguments to a panel of that Court, this Court issued a writ of

certiorari on its own initiative. 403 Md. 612, 943 A.2d 1244 (2008).

## Discussion

Because the case at bar is one in which the Circuit Court granted summary judgment, we must determine whether that ruling was "legally correct." *Murphy v. Merzbacher*, 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997). To make that determination, we must interpret the Health Care Worker Whistleblower Protection Act (the Act), a "remedial statute" that has been "on the books" since 2002.

In *Lockshin v. Semsker*, 412 Md. 257, 987 A.2d 18 (2010), this Court stated:

The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.

To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious

body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id.* at 274–76, 987 A.2d at 28–29 (internal citations omitted).

This Court has also stated that remedial statutes are to be construed liberally in favor of claimants "to suppress the evil and advance the remedy." *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 495, 914 A.2d 735, 750–51 (2007); *Montgomery County Bd. of Educ. v. Horace Mann Ins. Co.,* 383 Md. 527, 544, 860 A.2d 909, 919 (2004); *Marsheck v. Bd. of Trs. of the Fire & Police Employees' Retirement Sys. of the City of Baltimore,* 358 Md. 393, 403, 749 A.2d 774, 779 (2000); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Harrison v. John F. Pilli & Sons, Inc.,* 321 Md. 336, 341, 582 A.2d 1231, 1234 (1990).

In *Sears Roebuck and Co., et al. v. Wholey,* 139 Md.App. 642, 779 A.2d 408 (2001), *aff'd, Wholey v. Sears Roebuck, et al.,* 370 Md. 38, 803 A.2d 482 (2002), while reversing a "wrongful discharge" judgment entered on a jury verdict in favor of a former employee, the Court of Special Appeals stated:

In those Maryland cases recognizing a mandate of public policy well-established enough to form the predicate for an

action for wrongful discharge, there was a preexisting, unambiguous, and particularized announcement, by constitution, enactment, or prior judicial decision, directing, prohibiting or protecting the conduct (or contemplated conduct) in question, so as to make the Maryland public policy on the topic not a matter of judicial conjecture or even interpretation.

139 Md.App. at 660–61, 779 A.2d at 419.

The Health Care Worker Whistleblower Protection Act, Md.Code Ann., Health Occ. § § 1–501 to 1–506 (2002), is an unambiguous and particularized pronouncement of Maryland public policy. The Act, in pertinent part, provides:

§ 1–501.   Definitions

(a) In general.—In this subtitle the following words have the meanings indicated.

(b) Board.—"Board" means any board established under this article.

(c) Employee.—

(1) "Employee" means any individual licensed or certified by a board under this article who performs services for and under the control and direction of an employer for wages or other remuneration.

(2) "Employee" does not include a State employee.

(d) Supervisor.—"Supervisor" means any individual within an employer's organization who has the authority to direct and control the work performance of an employee, or who has managerial authority to take corrective action regarding the violation of a law, rule, or regulation of which the employee complains.

§ 1–502.   Prohibited acts

Subject to § 1–503 of this subtitle, an employer may not take or refuse to take any personnel action as reprisal against an employee because the employee:

**(1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation;**

(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by the employer; or

(3) Objects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation.

§ 1-503.   Requirements for protection

The protection provided against a violation of § 1-502 of this subtitle shall only apply if:

**(1) The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation;**

**(2) The employer's activity, policy, or practice that is the subject of the employee's disclosure poses a substantial and specific danger to the public health or safety; and**

(3) Before reporting to the board:

**(i) The employee has reported the activity, policy, or practice to a supervisor or administrator of the employer in writing and afforded the employer a reasonable opportunity to correct the activity, policy, or practice; or**

(ii) If the employer has a corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation, the employee has followed the plan.

§ 1-504.   Civil action and venue; limitation of action

(a) Civil action; venue.—Any employee who is subject to a personnel action in violation of § 1-502 of this subtitle may institute a civil action in the county where:

(1) The alleged violation occurred;

(2) The employee resides; or

(3) The employer maintains its principal offices in the State.

(b) Limitation of action.—The action shall be brought within 1 year after the alleged violation of § 1-502 of this subtitle occurred, or within 1 year after the employee first

became aware of the alleged violation of § 1–502 of this subtitle.

\* \* \*

§ 1–506.   Defenses

In any action brought under this subtitle, it is a defense that the personnel action was based on grounds other than the employee's exercise of any rights protected under this subtitle.

(Emphasis supplied).

## I.

We are persuaded that § 1–503(3) protects employers against frivolous Whistleblower actions asserted by disgruntled former employees who had (1) never "afforded the employer a reasonable opportunity to correct" the alleged "substantial and specific danger to the public health or safety," and/or (2) never followed the employer's "corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation."   The protection provided by the Act does not extend to former employees who made no *internal* reports at any point in time before their employment was terminated.

We are also persuaded, however, that § 1–503(3) was not enacted to protect an employer against a legitimate Whistleblower action asserted by a former employee who was fired before he or she made an external report, *provided that* the former employee *actually* "reported the activity, policy, or practice [that poses a substantial and specific danger to the public health or safety] to a supervisor or administrator of the employer in writing[.]"

As noted above, Appellee has conceded that the Act "clearly contemplates protection for employees who complain about misconduct, but are terminated prior to reporting the wrongdoing to the appropriate board [and that] an employer cannot evade the Act's mandate by terminating a complaining employee who has not yet been able to notify the appropriate

board." Appellee, however, continues to argue that (1) an external report to the appropriate board is "a necessary prerequisite for any claim of wrongful discharge under Maryland law[,]" and (2) Appellant's complaint must be dismissed on the ground that she has never made a report to the Board of Nursing. Because the Act expressly protects an employee who "threatens to disclose" as well as an employee who actually discloses, we reject the argument that a report to the Board of Nursing was an essential condition precedent to the action asserted in the case at bar.

As one commentator has stated:

Although it would clearly seem to be in employers' interest to encourage employees to report violations internally before (or instead of) making reports to governmental authorities, a number of courts that have addressed the issue have held that the public policy tort doctrine does not protect a whistleblower from retaliation unless he or she has gone outside the company with reports of wrongdoing.

The majority (and better) view, however, is that internal protests are enough, and that the viability of a public policy tort claim by a discharged whistleblower does not depend on whether or not the violations or illegal activities were reported to outside authorities.

Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 5.13 (1987 & Supp.2009–10) (footnotes omitted). We agree with that observation, which is consistent with the following cases.

In *Appeal of Bio Energy Corp.*, 135 N.H. 517, 607 A.2d 606 (1992), an employee was fired for reporting a violation of state law to her supervisor. "Bio Energy[,] argue[d] on appeal that Ms. Baron was not entitled to protection under the Act because she did not report her employer's allegedly unlawful conduct to a third party or governmental authority." *Id.* at 608. While acknowledging that the whistleblower statute at issue "fail[ed] to specify to whom a report of an alleged violation must be made" and that "Paragraph II of [the whistleblower statute] contains the requirement ... that in most circumstances the employee must first bring the alleged

violation to the attention of the employer," the New Hampshire Supreme Court stated:

> Bio Energy argues that, when read together, paragraphs I and II of RSA 275–E:2 (Supp.1991) require an employee to report a violation of law to a third party before she is entitled to protection under the Act. We reject that construction as contrary to the manifest purpose of the Act.
>
> Paragraph I of RSA 275–E:2 (Supp.1991) does not require that an employee report a potential violation of law to a third party. By its very terms, it covers reports made either to employers or to third parties. Paragraph II of RSA 275–E:2 (Supp.1991) sets forth the mode of compliance with the statute. Specifically, an employee must first notify the employer of any violation before reporting to a higher authority. The requirement that the employee first notify the employer is a significant benefit to employers and furthers the purpose of the Act. Giving the employer the first opportunity to correct a violation allows it to avoid harm to its reputation, the burden of undergoing an investigation, preparation for a hearing, etc. Informal resolution of infractions also saves the DOL both time and resources.
>
> We cannot accept Bio Energy's argument that the legislature intended that paragraph II of the Act require a further report to a third party. Under Bio Energy's interpretation of the Act, employers would be able to retain the benefit of notification, while avoiding the burdens imposed if the employee were discharged because of his or her notification to the employer. Such an interpretation would thwart the Act's primary purpose of encouraging employees to report their employers' violations of law.
>
> * * *
>
> Bio Energy argues that the "report" referred to in paragraph I must be made to someone other than the employer, because paragraph II requires the employee to "first" bring the violation to the employer's attention. Bio Energy contends that there would be no need for the requirement of a "first" report to the employer if the statute did not contemplate a further report to a third party.

To require a report to a third party or governmental authority where, as here, the initial report results in corrective action is to require the doing of a useless act. Once Bio Energy paid Ms. Baron the disputed wages, she had nothing to report. Had Bio Energy not wrongfully discharged her, the Act would have resulted in the very result that the legislature contemplated, namely a report of a violation by an employee and corrective action by the employer. The interpretation argued by Bio Energy undermines the deterrent effect of the Act; a reading of the statute that required a second report would leave employees such as Ms. Baron unprotected, despite the statute's clear intent to protect such employees from wrongful discharge.

\* \* \*

We construe statutes so as to effectuate their evident purpose. *Quality Carpets v. Carter,* 133 N.H. 887, 889, 587 A.2d 254, 255 (1991). The construction that Bio Energy advances is so inconsistent with the evident purpose of the Act as to render it impotent.

We wish to promote the dual purposes of the Act—to encourage employees to come forward and report violations without fear of losing their jobs and to ensure that as many alleged violations as possible are resolved informally within the workplace. Therefore, we hold that whenever an employee begins the process of complying with the Act, as specified in RSA 275–E:2, II (Supp.1991), he or she is protected under it, whether the violation is cured after notification of the employer, or whether the employee further reports the violation to a higher authority.

*Bio Energy,* 607A.2d at 608–09.

In *Barker v. State Insurance Fund,* 40 P.3d 463 (Okla.2001), the Oklahoma Supreme Court stated:

First, one of the primary goals of protecting whistle-blowers from retaliatory discharge is to reduce wrongdoing in a speedy, efficacious manner. In that respect, it makes sense to recognize claims of whistle-blowers who report wrongdoing within the employing organization to a person in a

position to investigate and remedy the wrongdoing. Second, internal disclosures are much less disruptive to the company than external disclosures. "Loyal employees, who do not go outside their organizations, should not have less protection than employees who could be considered more disruptive by complaining outside their organizations." Daniel P. Westman, Whistleblowing: The Law of Retaliatory Discharge, at 114 (1991). Oklahoma law protects both internal and external reporting of whistle-blowers who establish a sufficient public policy violation from retaliatory discharge.

*Id.* at 468.

In *Shea v. Emmanuel College,* 425 Mass. 761, 682 N.E.2d 1348 (1997), the Supreme Judicial Court of Massachusetts stated:

The distinction of importance is between a discharge for an employee's internal complaint about company policies or the violation of company rules, for which liability may not be imposed, and an internal complaint made about the alleged violation of the criminal law for which we now decide that liability may be imposed. In an opinion released the day after the entry of the Appeals Court memorandum and order in this case, a judge of the United States District Court for the District of Massachusetts correctly anticipated that this court "would not require the employee to complain outside the organization to claim the public policy exception for whistleblowers in a case like this." *Smith v. Mitre Corp.,* 949 F.Supp. 943, 950 (D.Mass.1997). In that case, the employee had reported fraud and false statements in claims made by the employer as a Federal contractor. A policy that protects an at-will employee who, in good faith, reports criminal conduct in her place of employment to public authorities, but does not protect an at-will employee who in good faith reports such conduct to her superiors would be illogical.

*Shea,* 682 N.E.2d at 1350.

In *Sullivan v. Massachusetts Mutual Life Insurance Co.,* 802 F.Supp. 716, 723 (D.Conn.1992), while applying Massachu-

setts law to a plaintiff's claims "that he was fired because he discovered, disclosed, and complained of defendants' violations of state and federal law and governing ethical codes with respect to the insider trading of securities," the United States District Court for the District of Connecticut stated:

In view of the expansive and evolving nature of liability for discharge against public policy under Massachusetts law, and the widespread recognition of liability for discharging "whistleblowers" in other jurisdictions, I conclude that plaintiff may state a claim upon which relief can be granted if he was fired because he "blew the whistle" on illegal practices at Mass. Mutual and Corporate Investors.

\* \* \*

With respect to the contention that plaintiff's merely internal complaints were inadequate, I note that in *Norris v. Lumbermen's Mutual Casualty*, 881 F.2d 1144, 1153 (1st Cir.1989), the Court of Appeals for the First Circuit, applying Massachusetts law, held that **an employer could be liable for the discharge of an employee because of his purely internal complaints of violations of Nuclear Regulatory Commission regulations. This rule makes sense. A rule that would permit the employer to fire a whistleblower with impunity before the employee contacted the authorities would encourage employers promptly to discharge employees who bring complaints to their attention, and would give employees with complaints an incentive to bypass management and go directly to the authorities.** This would deprive management of the opportunity to correct oversights straightaway, solve the problem by disciplining errant employees, or clear up a misunderstanding on the part of a whistleblower. The likely result of a contrary rule would be needless public investigations of matters best addressed internally in the first instance. Employers benefit from a system in which the employee reports suspected violations to the employer first; the employee should not, in any event, be penalized for bestowing that benefit on the employer. *See Appeal of Bio Energy Corp.*, 607 A.2d at 608–09 (despite language of New Hamp-

shire Whistleblower's Protection Act requiring employee to report suspected violation to the authorities, the employee is protected from discharge once he makes an internal complaint). I conclude that plaintiff's failure to contact the authorities concerning the alleged violations while he worked at Mass. Mutual does not by itself defeat his claim.

*Id.* at 723–25 (emphasis supplied).

The Court of Appeals of Arizona relied on the above-quoted language from *Sullivan* in rejecting an employer's argument that the employee's "failure to report the company's activities to outside authorities impairs his claim." *Murcott v. Best Western International, Inc.,* 198 Ariz. 349, 9 P.3d 1088, 1098 (Ct.App.2000). The *Murcott* Court held that internal complaints deserve the protection under the whistleblower exception to the at-will rule. *Id.*

In *Collier v. Superior Court,* 228 Cal.App.3d 1117, 279 Cal.Rptr. 453 (1991), the Court of Appeal of California, Second Appellate District, stated:

Labor Code section 1102.5, subdivision (b), which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency, reflects the broad public policy interest in encouraging workplace "whistleblowers," who may without fear of retaliation report concerns regarding an employer's illegal conduct. This public policy is the modern day equivalent of the long-established duty of the citizenry to bring to public attention the doings of a lawbreaker. (See Comment, *Protecting the Private Sector at Will Employee Who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy* (1977) 1977 Wis. L.Rev. 777.) Even though the statute addresses employee reports to public agencies rather than to the employer and thus does not provide direct protection to petitioner in this case, it does evince a strong public interest in encouraging employee reports of illegal activity in the workplace. (See *Verduzco v. General Dynamics, Convair Div.* (S.D.Cal.1990) 742 F.Supp. 559, 562.)

If public policy were strictly circumscribed by this statute to provide protection from retaliation only where employees report their reasonable suspicions directly to a public agency, a very practical interest in self preservation could deter employees from taking any action regarding reasonably founded suspicions of criminal conduct by coworkers. Under that circumstance, an employee who reports his or her suspicions to the employer would risk termination or other workplace retaliation. If this employee makes a report directly to a law enforcement agency, the employee would be protected from termination or other retaliation by the employer under Labor Code section 1102.5, but would face an obvious disruption of his or her relationship with the employer, who would be in the unfortunate position of responding to a public agency without first having had an opportunity to deal internally with the suspected problem. These discouraging options would leave the employee with only one truly safe course: do nothing at all.

The situation is no better for the responsible employer, who would be deprived of information which may be vital to the lawful operation of the workplace unless and until the employee deems the problem serious enough to warrant a report directly to a law enforcement agency. Clearly, the fundamental public interest in a workplace free from illegal practices would not be served by this result.

*Collier*, 279 Cal.Rptr. at 454.

In *Marques v. Fitzgerald*, 99 F.3d 1 (1st Cir.1996), the United States Court of Appeals for the First Circuit, stated:

[W]e take from both *[Bechtel Construction Co. v. Labor Sec'y*, 50 F.3d 926 (11th Cir.1995)] and *Bio Energy* an important and applicable public policy consideration—that employees should not be discouraged from reporting suspected violations initially to supervisors. We see no significant policy served by extending whistle-blower protection only to those who carry a complaint beyond the institutional wall, denying it to the employee who seeks to improve operations from within the organization. The latter course appears to us as more likely to lead to prompt resolution of

issues related to suspected violations of laws or regulations. We therefore conclude that a jury permissibly could find the Rhode Island Whistleblowers' Act applicable to statements made by an employee to a supervisor concerning known or suspected violations of the law. The terms of the statute specifically define a "public body" as including "[a] city governing body or any employee thereof." We do not read this language as covering all municipal employees, such as a co-worker, but as including a superior charged with carrying out the policies and decisions of the city. While the Act does not explicitly address statements to supervisors, as do other states' whistleblowers' statutes, the public policy behind these statutes is surely similar: to encourage the prompt reporting and early, amicable resolution of potentially dangerous workplace situations, and to protect those employees who do report such violations from retaliatory action by employers.

We do not, of course, hold that a verdict for Marques is therefore mandated; the jury must decide whether the statements he made fall under a more expansive reading of the statute than that allowed by the district court, and then whether Marques was actually fired as a result of his statements to Barlow. However, we think that the question of whether Marques' statements bring him within the protection of the Rhode Island Whistleblowers' Act was one for the jury, and not a proper subject for a directed verdict.

*Id.* at 6.

In *Carty v. Suter Co.* 371 Ill.App.3d 784, 309 Ill.Dec. 139, 863 N.E.2d 771 (2007), while holding that plaintiff stated a cause of action for retaliatory discharge in violation of public policy, the Illinois Appellate Court stated, " 'Failure to protect an employee who raises health concerns, even to his immediate supervisor, may stifle the willingness of other employees to complain of similar problems. To the protect the public, this result must be avoided.' " *Id.* at 775 (quoting *Lanning v. Morris Mobile Meals, Inc.,* 308 Ill.App.3d 490, 242 Ill.Dec. 173, 720 N.E.2d 1128 (1999)).

In *Fox v. District of Columbia*, 83 F.3d 1491 (D.C.Cir.1996), while vacating the dismissal of an action asserted by a former employee of the D.C. Lottery and Charitable Games Control Board who claimed that he was terminated for reporting a theft, the Court of Appeals for the District of Columbia stated:

The district court seemed to place great weight on the fact that Fox's report was made in the performance of his duties, unfavorably contrasting his "routine" report, made as part of his job, with unusual whistleblower complaints. *Fox[ v. District of Columbia]*, 877 F.Supp. [6] at 7–8. We see no convincing reason why the employee's sticking to standard internal channels for raising an alarm should count against him in this calculus. One might hypothesize that if the whistleblowing is within internal channels, that very fact must mean that the agency has provided for whistleblowing, so that there is no need for judicial interference. But that argument supposes that responses to actual instances of whistleblowing can safely be presumed proper—that an agency that has embraced a whistleblowing regime will rarely if ever try to punish and stifle any legitimate finger-pointing. But the possible reasons for selective permission of whistleblowing seem legion. Alternatively, it might be thought that the divide between internal and external communications may represent a rough cut between mere matters of employee grievance, which are unprotected under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and genuine issues of public concern. But that cut seems too rough—many internal office communications, Fox's included, bear no apparent connection to employee grievances. Accordingly, we are not surprised that our search has yielded no case supporting the idea that a communication made within internal channels is on that account any less likely to be about a matter of public concern.

*Fox*, 83 F.3d at 1494.

In *Babick v. Oregon Arena Corp.*, 333 Or. 401, 40 P.3d 1059, 1061–62 (2002), the Oregon Supreme Court has held that "a discharge of an at-will employee ... may be deemed 'wrong-

ful'. . . under certain circumstances. Examples of such circumstances include: (1) when the discharge is for exercising a job-related right that reflects an important public policy . . . ; or (2) when the discharge is for fulfilling some important public duty[.]" In *Love v. Polk County Fire District*, 209 Or.App. 474, 149 P.3d 199 (2006), while addressing the " 'important public duty' doctrine in 'whistleblower' situations[,]" the Court of Appeals of Oregon stated:

> In *Dalby v. Sisters of Providence*, 125 Or.App. 149, 865 P.2d 391 (1993), the plaintiff, a pharmacy technician responsible for taking a monthly inventory of the pharmacy's drugs, was discharged for reporting, to her supervisor, record-keeping inaccuracies that violated applicable provisions of the Oregon Administrative Rules. Likewise, in *Hirsovescu v. Shangri–La Corp.*, 113 Or.App. 145, 831 P.2d 73 (1992), the plaintiff, a maintenance worker in a residential care facility, was discharged because "he disclosed information about dangerous conditions and potential physical abuse of residents to a representative of the Oregon Mental Health and Developmental Disability Services Division[.]" *Id.* at 148–49[, 831 P.2d at 75]. In each case, we held that the plaintiffs' allegations, if proved, established wrongful discharge for fulfilling an "important public duty."
>
> Those cases are significant to this dispute because they recognize the existence of an important public duty to "blow the whistle" on certain behavior even in the absence of a specific statutory obligation to do so. That is, exposing certain statutory or regulatory violations, including health and safety violations, is sufficiently "important" that, under certain conditions, an employee who does so is protected from being discharged for that conduct.
>
> &#42; &#42; &#42;
>
> In *McQuary[v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 684 P.2d 21, *rev. den.*, 298 Or. 37, 688 P.2d 845 (1984)], the plaintiff, a training director at a licensed nursing home, was told by a patient that she had been abused by the facility's administrator. *Id.* at 109–10[, 684 P.2d at 22]. The plaintiff confronted the administrator, who was her

supervisor, about the abuse and threatened to report his conduct to the Health Division. The administrator terminated the plaintiff's employment and the plaintiff consequently filed a claim alleging wrongful discharge.

\* \* \*

.... [T]he discharge was actionable even though the plaintiff had only "threatened" to report the administrator's conduct. That was so because "[t]here is no reason that an employe[e]'s protection should depend on whether the employer acts before or after the employe[e] is able to file a complaint." *Id.* at 111 n. 5[, 684 P.2d at 23].

*Love,* 149 P.3d at 206–07.

Moreover, if an employer (1) corrects the activity that created a substantial danger, and (2) terminates the employment of the "meddlesome" employee who reported the problem that has been corrected, it would make no sense to impose an external report requirement that would accomplish nothing other than a drain upon the scarce resources of the appropriate board. While Appellee is entitled to support its "pretext" argument with evidence that Appellant has never made a report of the alleged wrongdoing to the Nursing Board, that argument must be presented to the trier-of-fact. We therefore hold that Appellee was not entitled to summary judgment on the ground that Appellant's lawsuit was not preceded by a complaint to the Nursing Board.

## II.

While Appellant has the burdens of production and persuasion on the issue of whether any of the violations that she reported to her supervisor actually did pose a *substantial and specific danger* to the public health or safety, a fact-intensive inquiry is necessary to resolve that issue. Taking the proffered evidence in a light most favorable to Appellant, her employment was terminated in retaliation for her complaint to a "supervisor" in Appellee's organization about conduct that constituted violations of the Maryland Controlled Dangerous Substances Act—a statute that establishes important public

policy with respect to the dispensation of controlled substances.

█ A Health Care Employer has a duty to correct violations that endanger the health and safety of patients to whom that employer owes a duty of care. When such violations are reported to one of its supervisors, a Health Care Employer cannot avoid liability under the Act on the ground that the violations it failed or refused to correct were committed by employees who had no authority to establish the employer's policy. For that reason, we also hold that Appellee was not entitled to summary judgment on the ground that Appellant's internal complaints involved conduct by fellow employees who had no authority to establish Appellee's policy or practice.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; APPELLEE TO PAY THE COSTS.**